# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

TAYLOR WOLFE,                            Case No. 1:19-cv-560
      Plaintiff,                       Cole, J.
                                         Litkovitz, M.J.

      vs.

CARTER'S, INC., et al.,              **REPORT AND**
      Defendant.               **RECOMMENDATION**

Plaintiff Taylor Wolfe brings this action against her former employer, Carter's Retail, Inc. ("Carter's"),[1] alleging claims of sexual discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and state law.  (Doc. 1).[2]  This matter is before the Court on defendant's motion for summary judgment (Doc. 32), plaintiff's response in opposition (Doc. 36), defendant's reply memorandum and motion to strike plaintiff's post-deposition affidavit (Doc. 39), plaintiff's response in opposition (Doc. 40), and defendant's sur-response contra plaintiff's memorandum (Doc. 41).

## I.  Factual allegations

Plaintiff began full-time employment with Carter's on May 16, 2016 as an assistant store manager.  (Doc. 26, Pltf. Depo. at PAGEID 109, 137-38; *see also* Doc. 26, Exh. 2).  Plaintiff was hired to work at the Crestview Hills, Kentucky location but also worked at the Mason, Kenwood, and Rookwood Ohio locations.  (Doc. 26, Pltf. Depo. at PAGEID 110-11).[3]  Plaintiff was given the employee handbook when she was hired and was also given a copy of any changed or updated policies instituted by Carter's throughout her employment.  (*Id*. at PAGEID 112-14).

---

[1] The Court notes that the parties jointly filed, and the Court granted, a motion to drop defendant Carter's, Inc. from the instant lawsuit (Doc. 30; 12/16/2020 docket entry notation order).  The sole remaining defendant in this lawsuit is Carter's Retail, Inc.
[2] Count V of plaintiff's complaint, "Wrongful Termination in Violation of Public Policy (Under Kentucky Law)" was dismissed without prejudice.  (*See* Doc. 31; 12/16/2020 docket entry notation order).
[3] Plaintiff clarified that the Kenwood location was not Carter's, but Oshkosh, which was owned by Carter's.  (*Id*. at PAGEID 111).

Updates were also posted on bulletin boards which plaintiff "frequently" checked. (*Id*. at PAGEID 115). It was part of plaintiff's job to have knowledge of the rules contained in the handbook. (*Id*. at PAGEID 113). Plaintiff understood that Carter's prohibited discrimination, including harassment, on the basis of sex and other categories. (*Id*. at PAGEID 120).

Plaintiff's supervisor was Jacqueline Salzer (*Id*. at PAGEID 139); Carla Brown was the "other assistant store manager" (*Id*. at PAGEID 141); and Jon Lamek was plaintiff's district manager. (*Id*. at PAGEID 147). Specifically, Lamek was the district manager for Carter's retail store locations in southern Ohio and northern Kentucky. (Doc. 29-3, Lamek Decl. at PAGEID 612).

### A. Communications between plaintiff and Lamek

Starting in October 2016, more than one-year prior to plaintiff's termination, Lamek sent plaintiff text messages outside of work. (Doc. 26, Pltf. Depo. at PAGEID 195-96). Although plaintiff was "unsure" of the number of text messages that she received from Lamek, plaintiff recalled instances where Lamek asked plaintiff to "grab a bite to eat" and sent her a text message that "he [Lamek] wished I could have gone [to the new store opening] so we could have grabbed a drink[.]" (*Id*. at PAGEID 197). In addition to text messages between plaintiff and Lamek, plaintiff testified that Lamek also asked plaintiff in-person "to grab a drink sometime," to which plaintiff responded that she "had a boyfriend and he wouldn't like it if I did that." (*Id*.). Plaintiff clarified that no communications, other than "basic work communication through the store's email, were exchanged through email." (*Id*. at PAGEID 196-97, 204). Plaintiff also testified that plaintiff and Lamek were "friends on Facebook for a moment, but no conversations were exchanged." (*Id*.).

Plaintiff believed that Lamek's conversations "were insinuating that he was pursuing me by asking me out to drinks and asking me – and saying it was good to see me[.]"  (*Id.* at PAGEID 204).  Plaintiff specified that while Lamek did not expressly say anything sexual to her, "[i]t was implied by saying like let's go grab a drink or I wish you were here at this store opening so we could grab a drink, and like staying in a hotel room next to his, that's all very implied scenarios that made me feel uncomfortable."  (*Id.* at PAGEID 205).

### B.  Light the Night event[4]

Plaintiff testified "around January of 2017 is when they [the text messages] became more intimate asking about nonwork-related things."  (*Id.* at PAGEID 196).  Plaintiff testified that plaintiff stopped responding to Lamek's text messages following the "Light the Night event, which was October of 2017," roughly six months prior to plaintiff's termination in March 2018. (*Id.*; Doc. 26-19 at PAGEID 311).

In October 2017, plaintiff attended the Light the Night event along with Rachel Ott and Ashley Simmons, both store associates at Carter's, and Lamek.  (*Id.* at PAGEID 199-200). Lamek introduced plaintiff to his fiancée as "this is Taylor, the girl who always texts me.  And he [Lamek] kind of made this like negative notion about any text messages we exchanged."  (*Id.* at PAGEID 202).  Plaintiff left "promptly" after the event and received a text message from Lamek while she was still in her car.  (*Id.*).[5]  Lamek thanked plaintiff for coming to the event and told her that he was very proud of the turnout because twenty-seven people attended this year as opposed to just six last year.  (Doc. 26, Exh. 22).  Lamek sent plaintiff a group photograph after plaintiff asked Lamek to "see the pic[.]"  (*Id.*).  Plaintiff said, "Look's great!!"  (*Id.*).  Plaintiff

---

[4] "Light The Night is a series of fundraising campaigns benefiting The Leukemia & Lymphoma Society's funding of research to find blood cancer cures."  *See* https://www.lightthenight.org/about (last visited on August 2, 2021)

[5] This communication between Lamek and plaintiff following the Light the Night event is the only text message offered as evidence by either party at this juncture.  (*See* Doc. 26, Pltf. Depo. at PAGEID 198-99; Doc. 26, Exh. 22).

and Lamek then both commented on a child featured in the photograph.  (*Id*.; *see also* Doc. 26, Pltf. Depo at PAGEID 201-02).

Plaintiff believed that Lamek was pursuing her romantically from this text message because she was the only person who received a message following the event, despite going with two other Carter's employees.  (Doc. 26, Pltf. Depo. at PAGEID 199).  Plaintiff testified, "he like singled me out and messaged me alone."  (*Id*. at PAGEID 200).  Plaintiff testified that Lamek did not say anything sexual to her in this text message.  (*Id*. at PAGEID 202-03). Following the Light the Night event, plaintiff alleges that "Lamek ultimately retaliated against [plaintiff] for rejecting his advances."  (Doc. 1 at PAGEID 4).

### C.  Policy violations

#### i.  Cell phone violation

Carter's Employee Success Guide states "[t]he use of personal cell phones or other media devices is not permitted . . . during work hours on the sales floor."  (Doc. 26-1 at PAGEID 265). Carter's Mobile Phones and Devices policy also states "[p]ersonal mobile devices are allowed to be worn by all employees during your scheduled shift [but] [m]obile devices are to be utilized for business/safety emergencies ONLY."  (Doc. 26-10, Ex. 10 at PAGEID 294).  Plaintiff testified that a different cell phone policy existed prior to her termination which allowed employees to have cell phones on their persons.  (Doc. 26, Pltf. Depo. at PAGEID 119, 129-30).  Plaintiff testified that "nobody ever got in trouble for making personal phone calls on their personal phone on the sales floor."  (*Id*. at PAGEID 131).

In January 2018, Salzer was reviewing video camera footage from the store and witnessed plaintiff and two other employees using their cellphones, exercising, and sitting on register countertops.  (Doc. 28, Salzer Depo. at PAGEID 545).  Salzer did not immediately

address these issues with plaintiff "because in fairness to her [plaintiff], I felt like I should address it with everyone, to make sure everyone was on the same page." (*Id*.).

### ii. Rewarding Moments violation

At the time of plaintiff's employment, Carter's maintained the Rewarding Moments Database, a private and secure database of customer information. (*Id*. at PAGEID 507). Carter's 2016 Loss Prevention Awareness policy states: "Do not allow anyone to view customer records or employee information without approval from [Human Resources] or [Loss Prevention]. We do NOT give anyone information from the Rewarding Moments database, even when requested to do so by the police, without HR or LP approval." (Doc. 26-7 at PAGEID 289). In 2017, the Loss Prevention policy was updated but the requirements remained the same, namely that employees are not to give out information from the Rewarding Moments database without prior approval from human resources or the Loss Prevention Manager. (Doc. 26-8 at PAGEID 292). Carter's also distributed a Rewarding Moments reminder which provided that employees are "not permitted to access Rewarding Moments information for anything or anyone other than the customer." (Doc. 26-9 at PAGEID 293).

On February 3, 2018, while plaintiff was working at Carter's, a police officer requested plaintiff's assistance while investigating a theft that had occurred at a nearby store. (Doc. 26, Pltf. Depo. at PAGEID 163-69). The police officer showed plaintiff a picture of the suspect, and plaintiff confirmed that the individual had been in the store. Plaintiff reprinted the individual's receipt and gave the police officer the individual's name. (Doc. 26, Exh. 13). Before calling the police, Brown "unequivocally told [plaintiff] that she should not provide customer information to the police" and doing do "would be a violation of the Company's policies." (Doc. 29-1, Brown

Decl. at PAGEID 606).  Plaintiff responded that she "didn't know."  (Doc. 26, Pltf. Depo. at PAGEID 171).

Following this incident, Brown contacted Salzer and informed her that plaintiff had given the police information regarding a shoplifter.  (Doc. 28-1 at PAGEID 567-68; Doc. 26, Exh. 15).  Salzer told Brown to let Lamek know of the situation.  (Doc. 26, Exh. 15; Doc. 26-1 at PAGEID 567-68).  Brown did so on February 5, 2018.  (*Id.* at PAGEID 578, 582, 584).  Specifically, Brown sent Lamek an email describing that plaintiff called the police and had given them a customer's name and phone number from the Rewarding Moments database.  (Doc. 26, Exh. 15).  Salzer confirmed that plaintiff shared information allegedly from the shoplifter's Rewarding Moments account.  (Doc. 28, Salzer Depo. at PAGEID 507).  Plaintiff disputes that the individual had a Rewarding Moments account.  (Doc. 26, Pltf. Depo. at PAGEID 168-69).  Plaintiff argues that "as best as I can remember," she "gave me her driver's license the day of" because "if it's a return without a receipt, then you have to take their name, phone number and email."  (*Id.* at PAGEID 169).

Lamek informed regional human resources manager Elisa Hudson about the situation.  (Doc. 27, Hudson Decl. at PAGEID 350; Doc. 27-1 at PAGEID 439).  Hudson asked Salzer to reach out to plaintiff and have plaintiff write a formal statement regarding the incident.  (Doc. 28-1 at PAGEID 574).  Hudson stated that she would review plaintiff's statement and make a decision.  (*Id.*).  On February 15, 2018, plaintiff wrote a statement about the incident explaining that she "reprinted [the shoplifter's] receipt and gave [the police] her name," and after reviewing video footage plaintiff "called the police and informed [them] that she had stolen from [Carter's]."  (Doc. 26-13 at PAGEID 301-02).

On February 18, 2018, Salzer emailed Lamek and explained that since the incident, plaintiff was speaking badly about Salzer to fellow employees believing that Salzer "tattled" on her.  (Doc. 28-1 at PAGEID 585).  Salzer stated, "I hope we can come to some resolution quickly before she [plaintiff] makes any further disruptions to the team."  (*Id*.).

On February 19, 2018, Lamek emailed Hudson and informed her that plaintiff provided the police with Rewarding Moments information.  (Doc. 27-1 at PAGEID 439).  Lamek said, "I've heard this has led to both final written correctives and termination depending on circumstances.  Taylor [plaintiff] has done a good job for us overall and would be generally considered close to top talent in the market, however her poor decision making here and the way she's chosen to react to this issue by creating a disruption in the store is concerning.  She has also had some inconsistencies in performance lately that Jackie [Salzer] has had to address after reviewing footage."  (*Id*.).  Hudson, however, stated that she did not rely on this statement made by Lamek in her decision to terminate plaintiff.  (Doc. 29-4, Hudson Decl. at PAGEID 619-20).

Based on the initial statements provided, Hudson was "on the fence on this one" and wanted to understand why plaintiff took the actions she did.  (Doc. 28-1 at PAGEID 588).  Hudson asked Salzer to gather more information and informed Lamek that "[Salzer] would like to term her."  (*Id*.).  On February 26, 2018, plaintiff wrote a second statement explaining that she and Salzer had gone over the Loss Prevention policy in 2017 and that on February 3, 2018, Brown informed plaintiff that she could not give out the information but that she did so anyways.  (Doc. 26-14 at PAGEID 303; *see also* Doc. 26, Pltf. Depo. at PAGEID 171).

On March 2, 2018, Hudson issued a "final warning" to plaintiff due to plaintiff's "violation of the Carter's Confidentiality policy."  (Doc. 26-16 at PAGEID 307).  Hudson testified that violating policy in this manner "could have been a terminable offense, but I erred

on the side of the associate [plaintiff] in this case and gave her a final warning." (Doc. 27, Hudson Depo. at PAGEID 373).

### iii.  Store keys policy violation

Carter's Store Keys policy states "[a]t least one key holder must be present in the store at all times.  Non-key holders inclusive of Customer Service Lead [CSL] are never to be alone in the store for security and customer service reasons."  (Doc. 26-11 at PAGEID 295).  The Loss Prevention Awareness policy states that "[a] Key Holder must be in the building at all times" and "[t]he Manager[']s office must be locked at all times."  (Doc. 26-6 at PAGEID 287).

Lindsey Frasure[6] was hired as a sales associate at Carter's in the spring of 2017.  (Doc. 28, Salzer Depo. at PAGEID 526).  From November 2017 to January 2018, Frasure was made a temporary/acting part-time supervisor, "which is a role that they [Carter's] enacted so there would be an additional key holder in the store."  (*Id*. at PAGEID 526-27).  Frasure was made a temporary key holder for the duration of this position.  (*Id*.).  When Frasure was appointed to the position, a store meeting was held where her role was explained to all employees as well as the duration of her appointment.  (*Id*. at PAGEID 528).  It was explained that Frasure would be a key holder while she held this position.  (*Id*.).  Salzer testified that "all team members were aware that that was a temporary role."  (*Id*. at PAGEID 529).  Frasure's keys were taken away at the end of the assignment, and she was thereafter made a CSL.  (*Id*. at PAGEID 526, 528).

On March 18, 2018, Brown contacted Salzer and informed her that plaintiff had left Frasure alone in the store.  (*Id*. at PAGEID 517-19; Doc. 28-2 at PAGEID 601).  Brown stated, "[s]he's got to go," to which Salzer explained she was "[j]ust trying to figure out how/when to

---

[6] The Court notes that Lindsey's last name is spelled differently in Salzer's deposition and in the parties' motions— the deposition references "Frazier" however, the parties use "Frasure."  For purposes of the motion for summary judgment, the Court will use the spelling as referenced by the parties.

report it. . . So it doesn't appear that I am ganging up on her [plaintiff]." (Doc. 28-2 at PAGEID 602-03). Salzer told Brown that Frasure should report the incident directly to Salzer or Lamek and not use Brown as an intermediary. (*Id*. at PAGEID 603). Salzer said that "this is the incident that led to her [plaintiff] being fired." (Doc. 28, Salzer Depo. at PAGEID 531). Brown reported to Lamek that plaintiff had violated the store keys policy by leaving Frasure, a non-key holder, in the store alone. (Doc. 29-3, Lamek Decl. at PAGEID 614).

### iv. Termination

On March 27, 2018, after Brown reported the incident, Lamek reviewed video footage and observed plaintiff on her cell phone during work hours, leave the store with no key-holding employee in the store, and leave the manager's office door open. (*Id*.). Lamek "reviewed the video footage of [plaintiff's] violations" with Salzer "prior to speaking with [plaintiff] regarding the footage." (*Id*.). Salzer also reviewed this footage with Lamek. (Doc. 28, Salzer Depo. at PAGEID 548, 550). Hudson asked Lamek to meet with plaintiff to get her side of the story regarding the alleged policy violations. (Doc. 27, Hudson Depo. at PAGEID 397). Lamek spoke with plaintiff about the alleged violations, which plaintiff "did not deny[.]" (Doc. 29-3, Lamek Decl. at PAGEID 614). Lamek emailed Hudson notes from his conversation with plaintiff about the three violations and informed Hudson that "[Salzer] is on board with dismissal[.]" (Doc. 29-3 at PAGEID 616-17). Hudson "knew from [her] discussions with Ms. Salzer that she supported termination of [plaintiff's] employment." (Doc. 29-4, Hudson Decl. at PAGEID 622).

Plaintiff was issued her termination statement on March 30, 2018 with the mobile phones, store keys, and office door policies cited as justification. (Doc. 26-19 at PAGEID 311). Plaintiff testified that she did not know who made the final decision to terminate her. (Doc. 26, Pltf. Depo. at PAGEID 186, 189). Hudson, however, explained that she makes the ultimate

decision when an employee is terminated, and Hudson did not have to obtain the permission of any other person before deciding to terminate an employee. (Doc. 27, Hudson Depo. at PAGEID 337). Lamek "did not make the decision to terminate [plaintiff]. This decision was communicated to [Lamek] by Elisa Hudson." (Doc. 29-3, Lamek Decl. at PAGEID 613). Hudson explained that in coming to plaintiff's termination decision, she looked at whether there was a specific policy being violated; whether there had been prior counseling discussions with the employee; what the current infractions were; and what plaintiff employee had to say in explanation for the infractions. (Doc. 27, Hudson Depo. at PAGEID 396-97). Hudson stated that plaintiff "was terminated for violating the store keys policy — itself a potentially terminable offense — while she [plaintiff] was on a recent final warning for violating the confidentiality and loss prevention awareness policies[.]" (Doc. 29-4, Hudson Decl. at PAGEID 621). Hudson explained that plaintiff leaving Frasure in the store was the biggest consideration in plaintiff's termination given that she was already on a final warning from the Rewarding Moments violation. (Doc. 27, Hudson Depo. at PAGEID 402; *see also* Doc. 29-4, Hudson Decl. at PAGEID 620).

Hudson testified that she would have terminated plaintiff even if plaintiff had not violated the phone and office door policies because violating the store keys policy, while plaintiff had already been given a final warning, is such a "serious offense." (Doc. 29-4, Hudson Decl. at PAGEID 621). Hudson was not aware of an employee who had violated the Rewarding Moments policy who was not given a final warning or terminated. (*Id*. at PAGEID 622). Lamek was also not aware of any employee who violated numerous policies while on a final warning who was not terminated. (Doc. 29-3, Lamek Decl. at PAGEID 614). In terminating plaintiff, Hudson did not "rely on any opinions, impressions, or commentary provided by Mr. Lamek

10

regarding Ms. Wolfe's performance, attitude or demeanor." (Doc. 29-4, Hudson Decl. at PAGEID 619).

## II. Defendant's motion to strike plaintiff's post-deposition affidavit

In response to defendant's motion for summary judgment (Doc. 32), plaintiff filed a fifty-two paragraph affidavit that purports to "expound[] on her deposition testimony by filling in gaps left as a result of Carter's questioning strategy." (Doc. 40 at PAGEID 784; Doc. 36-3, Pltf. Aff.). In her affidavit, plaintiff introduces additional examples of Lamek's allegedly harassing conduct: "The first text message communication he [Lamek] sent me from his personal cell phone entailed him asking me for my opinion on suits he was considering purchasing." (Doc. 36-3, Pltf. Aff. at PAGEID 726). Plaintiff also includes allegations about the frequency of Lamek's requests. Plaintiff states that Lamek "both via text message and in-person" "asked [plaintiff] out on numerous occasions – several times a month." (*Id*.). Plaintiff states that she "understood from these requests for dates that Mr. Lamek was pursuing me in a romantic or sexual manner." (*Id*. at PAGEID 726-27). Plaintiff further declares in her affidavit that "Lamek continued pursuing [her] despite [her] redirection" and plaintiff would "*frequently* remind him [Lamek] that [she] had a boyfriend, and that [her] boyfriend would not like it if [she] went out for drinks, or words substantially to that effect." (*Id*. at PAGEID 727) (emphasis added). Plaintiff states that Lamek "continued his regular pursuit of [her] via text message and in-person until approximately October of 2017, after the Light the Night event." (*Id*.). Plaintiff's affidavit also includes her recollection of events concerning Carter's confidentiality, store keys, cellphone, and office door policies. Plaintiff states her recollection was "refreshed as to Carter's confidentiality policy regarding loss prevention" and store keys policy after she reviewed the documents Carter's produced subsequent to her deposition. (*Id*. at PAGEID 728-29).

11

Defendant moves to strike plaintiff's affidavit that was attached to her response in opposition to defendant's motion for summary judgment.  (Doc. 39 at PAGEID 750-53). Defendant argues that plaintiff is attempting "to salvage her sexual harassment claim by adding . . . new evidence." (Doc. 39 at PAGEID 750).  Defendant contends that plaintiff's post-deposition affidavit "contradicts her own prior testimony" adduced at her deposition. (*Id*.). Specifically, defendant points to plaintiff's deposition testimony where she affirmed that "she had discussed all of the evidence that she had that she was sexually harassed" and confirmed that no "other evidence" existed "related to [her] claims." (*Id*. at PAGEID 750-51) (citing Doc. 26, Pltf. Depo. at PAGEID 205-07, 227).  Defendant contends that plaintiff's affidavit should be stricken because plaintiff "cannot contradict her prior testimony that there is no additional evidence beyond her deposition testimony[.]"  (*Id*. at PAGEID 751).

Plaintiff argues in response that her "affidavit does not contradict her deposition testimony, nor is it intended to create a 'sham issue,' and as such it is entirely permissible." (Doc. 40 at PAGEID 778).  Plaintiff contends that defendant employed a "deceptive strategy" when it "failed to directly question [her] about certain key events" and "asked her only limited questions about those events, so as to not elicit testimony about those events that could be harmful to Carter's." (*Id*.).  Plaintiff further argues that defendant "abruptly cut [plaintiff] off, rather than ask further questions that would have elicited more testimony about the nature and frequency of Lamek's conduct."  (*Id*. at PAGEID 782).  Plaintiff therefore contends that she "supplemented her deposition testimony with an affidavit" as she "tried to expound during her deposition but was not permitted to do so." (*Id*.).

It is accepted "that a party may not create a genuine issue of material fact by contradicting deposition testimony with a more recent affidavit." *U.S. v. Atlas Lederer Co*., 97

F. Supp. 2d 834, 838 (S.D. Ohio 2000) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1984)).  "[A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party."  *Id.* at 907.  "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction."  *Id.*  "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue."  *Id.*  Relevant factors in determining whether the affidavit attempts to create a "sham fact issue" include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain."  *Id.* at 909.

The record establishes that defendant expressly asked plaintiff if all of the evidence related to her sexual harassment claims was covered:

> Q.  Okay.  So have we covered all the evidence that you have that you say supports your sexual harassment claim?
> MR. DURST: Objection.
> You can answer.
> A.  All the hard evidence I have, yeah.
> Q.  And any other evidence?
> A.  Yes.
> Q.  Yes, we've covered it?
> A.  Yes.

(Doc. 26, Pltf. Depo. at PAGEID 206-07).  Further, plaintiff's contention that defendant employed a "deceptive strategy" and "abruptly cut [plaintiff] off, rather than ask further questions that would have elicited more testimony about the nature and frequency of Lamek's conduct" (Doc. 40 at PAGEID 778, 782) is expressly contradicted by the record.  Defendant asked plaintiff if she had "a full and fair opportunity" to discuss all the evidence that she had in support of her claims for discrimination, harassment, wrongful termination and retaliation.  (Doc. 26, Pltf. Depo. at PAGEID 225-25).  Plaintiff testified in response that "[t]here were incidents that I did not feel that I could fully explain because I was like cut off or I asked a question and it wasn't answered."  (*Id*. at PAGEID 225).  Plaintiff was given an opportunity to explain any such incidents, and she referenced the questions about making phone calls on the sales floor.  (*Id*. at PAGEID 225-26).  Following this exchange, plaintiff agreed that there was no additional evidence that was not mentioned during the deposition:

> Q.  Okay.  So do you have any other evidence that we haven't talked about?
> A. No.
> * * *
> Q.  Do you have any evidence that we haven't discussed related to that claim?
> A.  Related to the wrongful termination claim?
> MR. DURST: You're asking about physical evidence, documents?
> Q.  Any evidence.
> A.  Any physical, no.
> Q.  Any other evidence?
> A.  To that claim?
> Q.  Yes.
> * * * [discussion between counsel]
> Q.  Do you have any other evidence that we haven't discussed related to your claims?
> A.  Beyond every single thing that we've provided, no.

(*Id*. at PAGEID 226-27).

The deposition transcript therefore demonstrates that plaintiff was asked numerous times if she had any additional evidence related to her claims.  Plaintiff repeatedly answered, "No."

14

(*Id*. at PAGEID 206-07, 226-27).  Accordingly, plaintiff's statements in her post-deposition affidavit detailing additional conduct by Lamek, which were not discussed by plaintiff in her deposition testimony, are arguably contradictory, and at-odds, with her deposition testimony.  However, the Court need not determine whether plaintiff's post-deposition affidavit should be stricken because even considering the statements in plaintiff's affidavit, plaintiff fails to establish a genuine issue of material fact on her sexual harassment, hostile work environment, or retaliation claims for the reasons set forth below.

## III.  Standard of review

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A grant of summary judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts by 'citing to particular parts of materials in the record . . . or . . .  showing that the materials cited do not establish the absence . . . of a genuine dispute.'"  *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 403 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(1)).  The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party.  *Satterfield v. Tenn.*, 295 F.3d 611, 615 (6th Cir. 2002); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at

249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. Analysis

Plaintiff alleges four counts against defendant: Count I for sex discrimination and sexual harassment under state law; Count II for retaliation under state law; Count III for sex discrimination and sexual harassment under Title VII; and Count IV for retaliation under Title VII. (Doc. 1 at PAGEID 7-10). In Counts I and II of her complaint, plaintiff alleges that defendant violated Ky. Rev. Stat. § 344.040(1), "or in the alternative" Ohio Rev. Code § 4112 *et seq.* (*Id.* at PAGEID 7-8). In their summary judgment briefings, both parties appear to agree that Kentucky law applies to plaintiff's state law claims. (Doc. 32 at PAGEID 637-40; Doc. 36 at PAGEID 690). In any event, discrimination and retaliation claims under Ohio and Kentucky law require the same analysis as Title VII claims. *See Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000) ("Because the elements and legal standards for establishing unlawful sex discrimination are the same under Ohio Rev. Code § 4112.02 and under [Title VII], we need not analyze [plaintiff's] sex discrimination claims separately under state and federal law.") (internal citation omitted); *see also Hamilton v. General Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (Kentucky state law claim for retaliation evaluated under standard for Title VII claim); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 n.2 (6th Cir. 2000) (standards for Title VII are equally applicable to claims under Ohio Rev. Code § 4112); *Smith v. Leggett Wire Co.*, 220

16

F.3d 752, 758 (6th Cir. 2000) ("Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil

Rights Act of 1964 ('Title VII'), we use the federal standards for evaluating [] discrimination

claims."). Accordingly, because the same standards apply, the Court will analyze plaintiff's

federal and state discrimination and retaliation claims together. *See Robertson v. FinPan, Inc*.,

No. 1:18-cv-716, 2021 WL 2534174, at *3 (S.D. Ohio June 21, 2021).

### A. Sexual Harassment

Title VII of the Civil Rights Act of 1964 prohibits "'an employer to fail or refuse to hire

or to discharge any individual, or otherwise to discriminate against any individual with respect to

his compensation, terms, conditions, or privileges or employment because of such individual's . .

. sex.'" *Schmalz v. Northrop Grumman Corp*., No. 3:11-cv-145, 2012 WL 1813095, at *7 (S.D.

Ohio May 17, 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII specifically prohibits two

types of workplace sexual harassment: (1) quid pro quo harassment, and (2) harassment that

creates a "hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S.

57, 66 (1986). *See also McCaskill v. Alcoholism Council of the Greater Cincinnati Area*, No.

06-cv-743, 2008 WL 4449015, at *3 (S.D. Ohio Sept. 26, 2008); *Smith v. Meyer Builders*, No.

C-1-03-729, 2006 WL 543706, at *3 (S.D. Ohio Mar. 3, 2006). Although defendant contends

that plaintiff "did not plead a hostile work environment claim" (Doc. 32 at PAGEID 640 n.4),

plaintiff's complaint coupled with her response to defendant's motion for summary judgment

arguably merits the conclusion that "at the very least that she had plead both forms of

harassment. Therefore, the Court will address both forms." *Cremeens-Ashley v. Ohio/Dep't of

Youth Servs. Ohio River Valley Juv. Corr. Facility*, No. 1:11-cv-839, 2014 WL 1276148, at *6

(S.D. Ohio Mar. 27, 2014).

### i. Quid Pro Quo sexual harassment

"The Sixth Circuit has defined quid pro quo sexual harassment as harassment that is 'anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments.'" *Schmalz*, 2012 WL 1813095, at *9 (quoting *Highlander v. K.F.C. Nat'l Mgmt. Co*., 805 F.2d 644, 648 (1986)). *See Woods v. Burnham Indus. Contractors, Inc*., No. 2:08-cv-320, 2009 WL 3086573, at *9 (S.D. Ohio Sept. 22, 2009) (citations omitted) ("Quid pro quo sexual harassment occurs where the employee's submission to sexual advances is a condition for receiving job benefits."). Plaintiff must prove the following to succeed on a quid pro quo sexual harassment claim: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on her sex; (4) that either her submission to the unwelcome advances of a supervisor was an express or implied condition for receiving job benefits or her refusal to submit to the supervisor's unwelcome demands resulted in a tangible employment action (also called an adverse employment action); and (5) liability may be imputed to the employer. *Schmalz*, 2012 WL 1813095, at *9 (citing *Sanford v. Main St. Baptist Church Manor, Inc*., 327 F. App'x 587, 596-97 (6th Cir. 2009)). *See also Palmer v. Cacioppo*, 429 F. App'x 491, 499 (6th Cir. 2011).

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Henry v. Abbott Laboratories*, 651 F. App'x 494, 499 (6th Cir. 2016) (citing *White v. Columbus Metro. Housing Auth*., 429 F.3d 232, 240 (6th Cir. 2005)). If the employer satisfies this burden, the burden of production then shifts back to the plaintiff to show that the employer's proffered

legitimate, nondiscriminatory reason for the adverse employment action was mere pretext for intentional discrimination.  *Id*. (citing *White*, 429 F.3d at 238).  Plaintiff may demonstrate pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."  *Davis v. City of Clarksville*, 492 F. App'x 572, 580 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 (6th Cir. 2009)).  To survive summary judgment, the plaintiff "must produce sufficient evidence from which a jury could reasonably reject" the defendant's explanation for the termination.  *Davis*, 492 F. App'x at 580 (quoting *Chen*, 580 F.3d at 400).

Defendant concedes that plaintiff is a member of a protected class on the basis of her sex. (Doc. 32 at PAGEID 641).  The second element of a quid pro quo sexual harassment claim requires a showing of "unwelcome sexual harassment in the form of sexual advances or requests for sexual favors."  *Schmalz*, 2012 WL 1813095, at *9.  To demonstrate this element, "a plaintiff must present 'some evidence that, from an objective perspective, the alleged conduct carried with it an express or implied request for sexual favors in return for some action affecting the plaintiff's terms or conditions of employment.'"  *Id*. (quoting *Thomas v. Henderson*, 44 F. Supp. 2d 915, 926 (E.D. Mich. 1999)).  *See Heimberger v. Pritzker*, No. 2:12-cv-1064, 2014 WL 1050341, at *13 (S.D. Ohio Mar. 17, 2014) (although "[d]efendant's actions need not necessarily be of an overtly sexual nature, . . . a defendant's alleged conduct must 'carr[y] with it an express or implied request for sexual favors'" (quoting *Thompson*, 44 F. Supp. 2d. at 926).  A court examines a plaintiff's "words, deeds, and deportment" to determine whether defendant's conduct was "unwelcome."  *Heimberger*, 2014 WL 1050341, at *13 (S.D. Ohio Mar. 17, 2014) (quoting

*Souther v. Posen Constr., Inc*., 523 F. App'x 352, 355 (6th Cir. 2013)).  *See also Robertson*, 2021 WL 2534174, at *6 (same).

Defendant argues that there is no evidence in the record that plaintiff was subjected to unwelcomed sexual advances or requests for sexual favors.  (Doc. 32 at PAGEID 641).  Defendant contends that "[n]ot one of Mr. Lamek's alleged conversations or text messages of record indicates that his comments were sexual."  (*Id*. at PAGEID 642).  Defendant argues that Lamek allegedly asking plaintiff to grab a bite to eat and drink and telling plaintiff that he wished she would have attended a store opening event and referencing staying in the same hotel as plaintiff do not establish any unwelcomed sexual advances or requests for sexual favors sufficient to satisfy the second element of plaintiff's quid pro quo sexual harassment claim.  (*Id*. at PAGEID 642-43).  Plaintiff argues in opposition that "[a] reasonably jury could find that [plaintiff] was subject to unwelcome advances" because Lamek asked plaintiff "out on dates on numerous occasions and told her at one point that he wished she was with him on a work trip so that they could stay at the same hotel and go out for drinks together."  (Doc. 36 at PAGEID 692).

Plaintiff has not established a prima facie case of quid pro quo sexual discrimination because there is no genuine issue of material fact that Lamek's alleged conduct, from an objective perspective, did not carry "with it an express or implied request for sexual favors in return for some action affecting the plaintiff's terms or conditions of employment.'"  *Schmalz*, 2012 WL 1813095, at *9.  Here, plaintiff's own deposition testimony reflects that Lamek never said anything sexual to her:

Q.  And in no way did he [Lamek] say anything sexual to you?
A.  No.
* * *
A.  Again, he [Lamek] didn't say anything sexual to you, correct?

> Q.  It was implied by saying like let's go grab a drink or I wish you were here at this store opening so we could grab a drink, and like staying in a hotel room next to his, that's all very implied scenarios that made me feel uncomfortable.

(Doc. 26, Pltf. Depo. at PAGEID 202-03, 205).  Nowhere does plaintiff allege, however, that she and Lamek had any physical or sexual relationship, that Lamek ever placed, or attempted to place, his hands or other body parts on her, that Lamek made any sexual advances or requests for sexual favors, that Lamek ever commented on her physical appearance, or that Lamek ever said, or did, anything remotely sexual in nature to, around, or directed at, her.  *See Caimona v. Ohio Civ. Serv. Emps. Ass'n, AFSCME Loc. 11, AFL-CIO*, 814 F. App'x 130, 131 (6th Cir. 2020) (affirming the district court's granting of the defendant's summary judgment on the plaintiff's quid pro quo sexual harassment claim because the defendant never made any sexual propositions to the plaintiff, made any sexually suggestive comments about the two of them getting together, said anything to the plaintiff directly or indirectly indicating the defendant had any sexual interest in the plaintiff, never kissed the plaintiff or tried to do so, never sent the plaintiff any text messages, emails, photographs, letters, notes, or cards indicating the defendant wanted to have a sexual relationship with the plaintiff, never made any sexual propositions to the plaintiff, and never engaged in any teasing, kidding, or practical jokes with the plaintiff of a sexual nature).

Plaintiff alleges that Lamek's alleged "unwelcome" conduct consisted of Lamek asking plaintiff to grab a bite to eat, go out for drinks, and wishing that plaintiff could be at a new store opening so that they could get drinks and plaintiff could stay at the same hotel as him.  Plaintiff specifically testified that Lamek's text messages and communications made her "uncomfortable."  (Doc. 26, Pltf. Depo. at PAGEID 205).  Plaintiff's mere uncomfortableness, however, stemming from Lamek's alleged requests to grab drinks or get something to eat does not provide any evidence of "unwelcome sexual harassment in the form of sexual advances or

requests for sexual favors." *See Schmalz*, 2012 WL 1813095, at *9-10 (granting the defendant's motion for summary judgment on the plaintiff's claim for quid pro quo sexual harassment where the plaintiff acknowledged that the defendant did not make any sexual advances or requests for sexual favors). *Cf. Heimberger*, 2014 WL 1050341, at *2, 13 (the plaintiff alleged sufficient conduct to satisfy the second element of her quid pro quo sexual harassment claim where the defendant gave the plaintiff "unwanted personal attention" and "unwanted touching"; repeatedly asked the plaintiff to go on dates; was told by the defendant that she was "well put together" and "easy on the eyes"; made "multiple comments of a sexual nature"; forced her to ride with the defendant on personal errands; was personally touched against her will; and "asked her out on dates and for a commitment to a relationship").

Moreover, even considering the factual allegations in plaintiff's post-deposition affidavit that Lamek asked plaintiff for her "opinions on suits he was considering purchasing" (Doc. 36-3, Pltf. Aff. at PAGEID 726) and increasing the frequency that Lamek allegedly asked plaintiff out for drinks or to grab a bite to eat from "sometime[s]" (Doc. 26, Pltf. Depo. at PAGEID 196) to "several times a month" (Doc. 36-3, Pltf. Aff. at PAGEID 726), does not establish that plaintiff was subjected to unwelcome sexual harassment. Accordingly, there exists no genuine dispute of material fact that Lamek's conduct and communications toward plaintiff did not rise to the level sufficient to satisfy the second element of a quid pro quo sexual harassment claim, "unwelcome sexual harassment in the form of sexual advances or requests for sexual favors." *Schmalz*, 2012 WL 1813095, at *9.

Moreover, plaintiff's quid pro quo claim also fails on the basis that there exists no evidence that such alleged advances by Lamek were made as an "express or implied condition for receiving job benefits," nor (2) "refusing to submit resulted in a tangible job detriment." *See*

22

*Souther*, 523 F. App'x at 355 (citing *Highlander*, 805 F.2d at 648).  Plaintiff does not allege that

Lamek's communications, such as grabbing a bite to eat or drink, were conditioned upon

plaintiff receiving any job benefit.  Nor is there any evidence in the record that demonstrates as

much.  *See Prechtel v. Kellogg's*, 270 F. App'x 379, 381 (6th Cir. 2008) ("Absolutely no

evidence adduced in this case by the plaintiff suggests that Prechtel's rebuffs of Hauser's alleged

advances were the impetus for any adverse employment action.").  Accordingly, the Court

recommends that defendant's motion for summary judgment should be granted as to plaintiff's

quid pro quo sexual harassment claim because no genuine dispute as to any material fact exists.[7]

### ii.  Hostile work environment

Plaintiff also alleges that Lamek's conduct gave rise to a hostile work environment.  (*See*

Doc. 1; Doc. 36 at PAGEID 693-95).  Title VII protects employees from discriminatory hostile

or abusive work environments.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing

*Meritor Savings Bank*, 477 U.S. at 64).  To prove a hostile work environment claim based on

sex, a plaintiff must show that: (1) she was a member of the protected class; (2) she was

subjected to unwelcome sexual harassment, based on her sex; (3) the harassment had the effect

of unreasonably interfering with her work performance and created an objectively intimidating,

hostile, or offensive work environment; and (4) there exists some basis for liability on the part of

the employer.  *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013) (citing

*Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008)).  *See also Schmalz*, 2012 WL 1813095, at

*7 ("Plaintiff must prove that she was subjected to unwelcome sexual harassment of a severe or

pervasive nature that interfered with her work performance and created a hostile environment, as

---

[7] The Court need not determine whether there exists a genuine issue of material fact as to the remaining elements of plaintiff's quid pro quo sexual harassment claim because, as discussed, there is no genuine issue of material fact that plaintiff was not subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

well as a basis for vicarious liability against Defendant.") (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

In terms of the third factor, the conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Warf*, 713 F.3d at 878 (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)). In determining whether a work environment is objectively hostile or abusive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris*, 510 U.S. at 23). Conduct that is "merely offensive" is insufficient to support a hostile work environment claim. *Harris*, 510 U.S. at 21. "[C]omments and harassing acts of a continual nature are more likely to be deemed pervasive." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). Moreover, "courts must determine whether the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Grace*, 521 F.3d at 678-79 (quoting *Harris*, 510 U.S. at 23) (internal quotes omitted).

As explained above, no genuine dispute of material fact exists that plaintiff was not subjected to unwelcome sexual harassment based on her sex. Even so, plaintiff has also failed to establish that she was subjected to a hostile work environment that was severe or pervasive. As best the Court can discern, plaintiff alleges that she was subjected to a "hostile work

24

environment" (Doc. 36 at PAGEID 693) but she has not produced evidence to show she was subjected to severe and pervasive harassment that falls within the purview of the Title VII.

Plaintiff's allegations indicate that her claim of a hostile work environment is premised on her "continual[] reject[ion]" of "Lamek's romantic advances toward [plaintiff that] took place over approximately nine months." (*Id*. at PAGEID 694). Plaintiff specifically states that Lamek invited her for "food and/or drinks" and to other unspecified "non-work-related activities" "several" times per month over a nine-month period. (Doc. 36-3, Pltf. Aff. at PAGEID 726). Plaintiff, however, does not allege that any of Lamek's requests were overtly sexual in nature or physically threatening. Nor does plaintiff allege that Lamek made any sexual remarks or jokes in her presence or physically touched her in an offensive manner.

Plaintiff alleges on one occasion that Lamek made a remark that she felt was "humiliating": "And he [Lamek] introduced me to his fiancée. And he like singled me out. He was like, this is Ashley, this is Rachel, this is Taylor, the girl who always texts me. And he kind of made this like negative notion about any text messages we exchanged." (Doc. 26, Pltf. Depo. at PAGEID 202). While the Court has no doubt that plaintiff may have subjectively found Lamek's statements at the Light at the Night event "exceedingly humiliating" (Doc. 36 at PAGEID 694), plaintiff fails to explain how this single comment about texting, even when coupled with Lamek's invitations to grab a drink or get a bite to eat, or on one occasion expressed his wish that they stay at the same hotel so they could get a drink, was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. . . ." *Warf*, 713 F.3d at 878 (quoting *Bowman*, 220 F.3d at 463).

In examining relevant Sixth Circuit authority, there is no genuine issue of material fact that Lamek's conduct was not severe or pervasive enough to create an environment that a

reasonable person would find hostile or abusive. *See, e.g., Bowman*, 220 F.3d at 458-59, 464 (finding the defendant's conduct not sufficiently severe or pervasive to constitute a hostile work environment where the defendant placed her hand on the plaintiff's shoulder and rubbed it, grabbed the plaintiff's buttocks and said "she controlled [the plaintiff's] ass and she would do whatever she wanted with it," told the plaintiff, "[l]et's get it finished, you and I can try [the whirlpool] out together" after the plaintiff went to the defendant's house to fix her deck, told the plaintiff, "[n]ext time, you know, you ought to come by yourself and enjoy yourself" when the plaintiff came with his girlfriend to the defendant's house to go swimming in her pool, and put her finger on the plaintiff's chest, placed her hands upon him, and pushed him towards a door while in the defendant's office); *Morris v. Oldham Cty. Fiscal Ct*., 201 F.3d 784, 787, 790 (6th Cir. 2000) (finding the plaintiff could not establish that she was subjected to a hostile working environment where the plaintiff's supervisor "frequently told jokes with sexual overtones, once referred to [the] plaintiff as 'Hot Lips,' and several times made comments about [the plaintiff's] state of dress"); *Crowe v. Ohio Dep't of Rehab. & Corr*., Nos. 98-4024, 98-4126, 1999 WL 717947, at *1-2, 5 (6th Cir. Sept. 10, 1999) (rejecting hostile work environment claim where the plaintiff's supervisor sent her flowers at home and at work, left candy and notes at her desk, sent cards and emotional letters to her home, asked to see her socially outside of work, showed up uninvited to talk to her in public places she would frequently visit, inquired about her afterwork plans, told her he had dreams about her and requested her home phone number, told her she smelled great, asked her to accompany him on vacations, ran his fingers across her hand, attempted to close an automatically locking door behind him with the plaintiff in the room, recited pickup lines to the plaintiff, and reached across a vehicle towards the plaintiff while driving together on work-errands and tried to fasten her seat belt stating that he "wouldn't want

[her] to smash [her] pretty face against the windshield"); *Stacy v. Shoney's, Inc.*, No. 97-5393, 1998 WL 165139, at *1, 3 (6th Cir. Mar. 31, 1998) (finding no hostile work environment on summary judgment where the manager of the restaurant where the plaintiff worked called the plaintiff at her home and told her that he missed her, inappropriately touched her breast when he removed and replaced an ink pen from her front shirt pocket and said, "That's a nice pen," and made sexually suggestive comments about her appearance, such as, "Your tan sure does look good I wish I could see more of it"; "I like it better when you wear your hair down"; "[I]f [I] had someone that looked like you, I'd not let them leave the house"; and "I'd move in with you and take care of you"); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 334-35, 337 (7th Cir. 1993) (finding that a supervisor who called the plaintiff "dumb blond," placed "I love you" signs in her work area, asked her for a date, put his hands on her shoulder, and tried to kiss her, did not create an objectively hostile work environment). *Cf. Hawkins*, 517 F.3d at 334 (denying the defendant's motion for summary judgment when the plaintiff's supervisor "made regular crass and sexual references to her private body parts, requested oral sex in graphic terms, and solicited sex from her on multiple occasions, regularly attempted to touch her while they worked on the line, rubbed against her with his private parts, and tried to grab her waist").

Moreover, plaintiff has alleged no facts, and there exists no genuine dispute of material fact, that Lamek's alleged harassment did not unreasonably interfere with plaintiff's work performance. "To show such interference, the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a reasonable person subjected to the discriminatory conduct would find . . . that the harassment so altered working conditions as to ma[k]e it more difficult to do the job." *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring) (internal citations and quotation marks omitted).

Plaintiff avers that "[a]fter the Light the Night event, [she] no longer felt comfortable around Mr. Lamek and would avoid him when he came to [the store where she worked], which made it harder for [her] to do [her] job." (Doc. 36-3, Pltf. Aff. at PAGEID 727-28). Plaintiff fails to demonstrate how Lamek's alleged advances unreasonably interfered with plaintiff's work performance. *See Prechtel*, 270 F. App'x at 381-82. Plaintiff only indicated that it was harder for her to do her job when Lamek came into her store because she would have to avoid him. Plaintiff did not testify that she had any difficulty concentrating or that she was unable to work continuously. *See Rayford*, 489 F. App'x at 5 (the "alleged incidents of harassment" did not interfere with the plaintiff's "work performance" because although the plaintiff "testified that he had difficulty concentrating at times, he also testified he was able to work regularly and continuously and perform his job duties").

Considering the totality of the circumstances, the Court finds that there is no genuine issue of material fact that Lamek's conduct does not rise to the requisite level of severity or pervasiveness. *See, e.g., Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 630 (6th Cir. 2013) (affirming the district court's granting of summary judgment where "neither the text messages nor the interactions between [the defendant and the plaintiff] at work [was] so severe or pervasive that an objectively hostile environment was created"); *Rayford v. Illinois Cent. R.R.*, 489 F. App'x 1, 5 (6th Cir. 2012) (finding comments made three or four times per week, such as being called "sweet booty" and being told a co-worker "wanted to mix coffee with his cream" and that "Ray got a big dick" for him, were "not so severe and pervasive that a reasonable person would find his work environment hostile and abusive"); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707-08 (6th Cir. 2007) ("fifteen specific incidents spanning a two-year period" were "isolated" and "not pervasive"); *Stevens v. Henderson*, No. C-2-98-615, 2000 WL 1456919 (S.D.

Ohio Sept. 19, 2000) (granting summary judgment on plaintiff's hostile work environment claim despite evidence of "a tray label card with a rose drawn on it[,] . . . a letter . . . that stated [the defendant's] desire to become plaintiff's secret love, that he wanted the plaintiff to 'feel good,' that plaintiff had a 'sexy body,' and that he wanted to give plaintiff a 'tongue bath'"); *Grigaliunas v. Rockwell Int'l Corp.*, No. 3:98-cv-7351, 1999 WL 681509 (N.D. Ohio July 6, 1999) (granting the defendant's motion for summary judgment and finding no severe or pervasive sexual harassment where the defendant made "sexually suggestive, inappropriate and unwelcome remarks to [the plaintiff] on a daily basis" and "kissed and hugged [the plaintiff] without her consent on multiple occasions"); *Schmalz*, 2012 WL 1813095, at *8-9 (finding plaintiff's allegations were insufficient to rise to the level of actionable harassment); *Moorer v. Summit Cty. Dep't of Job & Fam. Servs.*, No. 5:10-cv-457, 2011 WL 2746098, at *4 (N.D. Ohio July 14, 2011) (granting the defendant's motion for summary judgment on the plaintiff's hostile work environment claim even though the defendant "smacked [the plaintiff] on the rear end . . . and made comments and unwanted advances of a sexual nature toward Plaintiff for several months").

Plaintiff has failed to establish any genuine issue of material fact on the prima facie elements of her sexual harassment claims.  Therefore, defendant's motion for summary judgment should be granted on plaintiff's sexual harassment employment discrimination claims.

### B.  Retaliation

Defendant moves for summary judgment on plaintiff's retaliation claims.  Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII]. . . ." 42 U.S.C. § 2000e-3(a).  To state a claim for retaliation, a plaintiff must allege that (1) she engaged in protected activity; (2) her exercise of

that activity was known by the defendant; (3) the defendant thereafter took an action that was materially adverse to her; and (4) there was a causal connection between the protected activity and the materially adverse action. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

Defendant argues that plaintiff cannot establish a prima facie case of retaliation because there is no evidence that plaintiff engaged in protected activity. (Doc. 32 at PAGEID 651). Defendant argues that plaintiff did not tell Lamek "that she considered his communications to be indicative of him having romantic interest in her – much less that she objected to it as unwelcome sexual harassment[.]" (*Id*.). Defendant argues that plaintiff's actions of "declining a drink or meal are insufficient to constitute legally protected opposition to unlawful conduct." (*Id*. at PAGEID 652). Defendant also contends that plaintiff neither reported Lamek to human resources or management nor did she file a complaint with Carter's pursuant to the "plethora of reporting and complaint mechanisms available to her." (*Id*. at PAGEID 651).

Plaintiff argues in opposition that she "explicitly told Lamek that she had a boyfriend and that she would not go out with him for that reason." (Doc. 36 at PAGEID 696). Plaintiff therefore contends that a genuine material of fact exists because her "explicit statement to Lamek constituted a demand that he cease his harassing conduct." (*Id*.).

"Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ("EEOC") and opposition to an apparent Title VII violation." *Wasek v. Arrow Energy Servs., Inc*., 682 F.3d 463, 469 (6th Cir. 2012) (citing *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1313 (6th Cir.1989)). It is undisputed that plaintiff did not file an EEOC claim until January 16, 2019, nearly ten months following her March 2018 termination from Carter's. (Doc. 1 at PAGEID 2). Accordingly,

plaintiff's EEOC filing cannot serve as the basis for her retaliation cause of action. *See generally DePalma v. Sec'y of Air Force*, 754 F. App'x 321, 330 (6th Cir. 2018); *Greathouse v. Westfall*, 212 F. App'x 379, 385-86 (6th Cir. 2006). It is also undisputed that plaintiff failed to report Lamek's allegedly harassing behavior to human resources or management despite having knowledge of Carter's complaint reporting procedure. (*See* Doc. 26, Pltf. Depo. at PAGEID 120-22, 205). Specifically, plaintiff failed to report any alleged instances of Lamek's behavior despite acknowledging in her deposition that Carter's prohibited discrimination, including harassment, on the basis of sex and other categories; encouraged her and other employees to report any violations of the equal employment policy; and had a complaint reporting procedure whereby plaintiff could report, and thereafter be protected against retaliation for making such reports, complaints of violations of the policy including the equal employment and harassment policies. (*Id*.).

Plaintiff can nevertheless avoid summary judgment if she can prove that she demanded that Lamek, a supervisor, cease his harassing conduct. *See E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015). In *New Breed Logistics*, the Sixth Circuit specified that "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." *Id*. There, the EEOC brought a Title VII sexual harassment and retaliation action against a defendant-employer alleging that the supervisor sexually harassed three female employees and retaliated against them after they objected to his sexual advances and retaliated against a male employee who verbally opposed the supervisor's sexual harassment and supported the female employees' complaints. *Id*. at 1061-62. Specifically, one employee said that her supervisor "would make sexual comments to her several times a day, 'every day'" and that "she told her supervisor to 'leave [her] alone' daily." *Id*. at 1062. Another employee said that the

same supervisor made similar sexually explicit comments to her during her employment and that

the supervisor's harassment often involved physical contact. *Id*. This employee told her

supervisor to "stop touching" her and to "stop talking dirty to [her] like he was and to other

people as well because he was going to get in trouble" in response. *Id*. A third employee "went

off" on the supervisor and told him "get the f— out of my face. I d[on't] want to hear that [s——]

today" after the supervisor made a sexual comment to her at her desk. *Id*. at 1063. Finally, the

fourth employee, after he witnessed and overheard the supervisor's harassment towards female

employees "admonished [the supervisor], telling him to 'calm down on making them comments

because I don't believe them women was liking that.'" *Id*. The Sixth Circuit found that all four

employees' demands that their supervisor cease his sexually harassing conduct qualified as

protected activity under Title VII. *Id*. at 1061, 1067-68. *See also Nash v. McHugh*, No. 15-C-

93, 2016 WL 204483, at *3 (M.D. Tenn. Jan. 15, 2016) (reporting unlawful actions directly to

harassing supervisor constituted protected activity); *Pendleton v. Bob Frensley Chrysler Jeep*

*Dodge Ram, Inc*., No. 3:14 C 02325, 2016 WL 2927983, at *8 (M.D. Tenn. May 19, 2016)

(plaintiff's complaints to supervisor and another manager "every day" that "the n—— jokes have

to stop" constituted protected conduct.).

Unlike how the four employees in *New Breed Logistics* affirmatively demanded that the

supervisor stop his sexually harassing behavior, here, plaintiff told Lamek that she "had a

boyfriend and he wouldn't like it if I did that," in response to Lamek asking if she wanted to get

a drink. (Doc. 26, Pltf. Depo. at PAGEID 197). Plaintiff's statements declining Lamek's

invitations because her boyfriend would not like it are too vague to qualify as opposition to an

unlawful employment practice. Plaintiff's statements cannot reasonably be construed as a

demand to Lamek to stop any particular behavior, let alone sexually harassing behavior. There exists no genuine issue of material that plaintiff did not engage in protected conduct.

Nevertheless, even assuming that plaintiff engaged in protected conduct by informing Lamek that she had a boyfriend and her boyfriend would not like it if she went out for a drink with Lamek, plaintiff must still have a reasonable, good faith belief that Lamek committed an unlawful employment practice for her retaliation claim to survive the summary judgment threshold. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015). *See also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001) (considering whether plaintiff could have reasonably believed that alleged harassment violated Title VII in determining whether plaintiff's retaliation claim was actionable). The reasonable, good faith belief requirement has both subjective and objective components. The subjective component requires that the "employee complaining of a hostile work environment must 'actually believe[] that the conduct complained of constituted a violation of relevant law.'" *Yazdian*, 793 F.3d at 646 (quoting *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015)). The objective component requires that "'a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee' would believe that the conduct complained of was unlawful." *Id.* Objective reasonableness is decided as a matter of law "only when no reasonable person could have believed that the facts known to the plaintiff amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring." *Id.* As explained above, the Court concludes that no reasonable person would believe that Lamek's inquiries to grab a drink or bite to eat, along with his hope or wish that plaintiff could have come to the new store opening, constituted unlawful sex harassment based on a quid pro quo or sexually hostile work environment claim.

33

"In the event that reported conduct is not serious enough that a reasonable person could believe it violated Title VII, a claim for retaliation will not lie." *EEOC v. Rocket Enters.*, No. 06-14319, 2008 WL 724613, *4 (E.D. Mich. Mar. 18, 2008) (citing *Breeden*, 532 U.S. at 271). For example, in *Breeden*, the Supreme Court held that the plaintiff's retaliation claim based on complaints of sexual harassment was foreclosed where no reasonable person could have believed that a co-worker's single, sexually explicit comment violated Title VII. *Breeden*, 532 U.S. at 271.  Here, no reasonable employee would believe that Lamek's alleged conduct of asking plaintiff out for drinks, to grab a bite to eat, or telling plaintiff that he wished she was at a new store opening so that they could stay in the same hotel and get drinks, created a sexually hostile work environment, or constituted a quid pro quo claim of sexual harassment, under Title VII. Moreover, even if plaintiff's statements in her post-deposition affidavit that plaintiff "would frequently remind him [Lamek] that [she] had a boyfriend" (Doc. 36-3, Pltf. Aff. at PAGEID 727) constituted "protected conduct," there still exists no genuine issue of material fact as to the objective component of the protected activity requirement of plaintiff's retaliation claim.

Accordingly, the Court recommends that defendant's motion for summary judgment be granted on plaintiff's retaliation claims because there exists no genuine issue of material fact as to the objective component of the protected activity requirement of plaintiff's retaliation claim. [8]

---

[8] The Court need not determine whether there exists a genuine issue of material fact as to the remaining elements of plaintiff's retaliation claim because, as discussed, plaintiff has not introduced any evidence to show there is a genuine factual dispute as to whether plaintiff engaged in protected conduct.  Moreover, the undisputed evidence shows that no reasonable person would believe that Lamek's inquiries to plaintiff constituted unlawful sexual harassment based on a quid pro quo or sexually hostile work environment claim.

## V.  Conclusion

The undisputed evidence shows that there exists no genuine issue of material fact on any of plaintiff's claims.  Defendant therefore is therefore entitled to summary judgment on plaintiff's claims.

### IT IS THEREFORE RECOMMENDED THAT:

1.  Defendant's motion for summary judgment (Doc. 32) be **GRANTED**.

2.  Defendant's motion to strike plaintiff's affidavit (Doc. 39) be **DENIED** as moot.

Date: ___8/11/2021___

Karen L. Litkovitz
Chief United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TAYLOR WOLFE,                                    Case No. 1:19-cv-560
      Plaintiff,                            Cole, J.
                                                 Litkovitz, M.J.

      vs.

CARTER'S, INC., et al.,
      Defendant.                            **NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation within **FOURTEEN (14) DAYS** after being served with a copy thereof. This period may be extended further by the Court on timely motion by either side for an extension of time. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).